# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 18-0039V
UNPUBLISHED

| | |
|---|---|
| DEAN LESLIE,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: January 28, 2021<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Isaiah Richard Kalinowski*, Maglio Christopher & Toale, PA, Washington, DC, for Petitioner.

*Colleen Clemons Hartley*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On January 8, 2018, Dean Leslie, M.D. filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving the influenza ("flu") vaccine on September 30, 2016. Petition at ¶¶ 1, 14, 17. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

Respondent conceded Dr. Leslie's entitlement to a damages award, but the parties could not agree on a final total sum, resulting in a damages hearing held earlier this

---

[1] Because this Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

month. For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount **$131,321.86, representing $125,000.00 for his past pain and suffering, and $6,321.86 for his unreimbursed out-of-pocket expenses.**

### I. Relevant Procedural History

Because Dr. Leslie is a physician, there are fewer formal medical records filed in this matter than would be found in other cases. Within a month of the Petition's filing, he had filed the affidavit and medical records required by the Vaccine Act. Exhibits 1-8, ECF Nos. 5, 8, 10; *see* Section 11 (c). Over the subsequent nine-month period, while awaiting Respondent's review, Petitioner filed additional evidence such as the written report of his injury which he submitted to the vaccine administrator, additional affidavits, documentation regarding other vaccine injuries, and medical literature. Exhibits 9-16, ECF Nos. 11, 13, 22.

On November 14, 2018, Respondent indicated he wished to file a Rule 4 Report but would welcome a demand from Petitioner. ECF No. 23. Petitioner conveyed his demand to Respondent on January 10, 2019. ECF No 26. Respondent filed his Rule 4 Report on March 4, 2019, conceding entitlement, and I issued a Ruling consistent with the concession few days thereafter. ECF Nos. 28, 30.

Thereafter, from early March through July 2019, the parties attempted to informally resolve the issue of damages. *See,* e.g., Status Report, ECF No. 36. On July 30, 2019, the parties filed separate status reports indicating they were having difficulty agreeing upon the amount of Petitioner's out-of-pocket expenses. ECF Nos. 41-42. Since Petitioner worked as a radiologist on a contract basis at the facility where he received the vaccine in question, the facility had an informal agreement with Petitioner to either write-off or pay many of Petitioner's costs. ECF No. 49. Due to the informal nature of this agreement, the parties were having trouble ascertaining which expenses were ultimately paid by Petitioner. *Id.* at 2.

On February 28, 2020, Petitioner filed a joint status report on behalf of the parties stating that they had agreed upon an appropriate amount of compensation for Petitioner's out-of-pocket expenses, but no longer agreed upon the amount to be awarded for Petitioner's pain and suffering. ECF No. 56. Over the next two months, Petitioner filed medical literature, including the draft of an article regarding Petitioner's injury, and his damages brief. Exhibits 28-30, ECF Nos. 58, 61; Petitioner's Memorandum of Law Regarding Damages ("Pet. Brief"), ECF No. 62. In it, Petitioner described the unique nature of his SIRVA injury and requested a damages hearing so he and his wife could provide testimony regarding the severity of his symptoms. Pet. Brief at 11-12. Respondent filed his brief approximately two months later, setting forth his arguments and opposition

to Petitioner's request for a hearing. Respondent's Brief on Damages ("Res. Brief"), ECF No. 64.

I held a call with the parties on August 19, 2020, to discuss Petitioner's hearing request and Respondent's concern that Petitioner not testify as an expert. ECF No. 67. I scheduled a damages hearing for January 12, 2021, and instructed that Petitioner's testimony should be limited to a description of the symptoms he experienced. *Id.* Prior to the damages hearing, Petitioner filed a reply brief, the finalized version of the article written about his SIRVA injury, and further imaging. ECF Nos. 66, 69, 71. The damages hearing was held as scheduled.

## II.     Factual History

### A.     Medical Records

Prior to the relevant vaccination, Dr. Leslie was a healthy individual who exercised daily and whose only concerns were dry eyes and sleep deprivation due to his demanding work schedule. Exhibit 1 at 72 (record from March 31, 2015 visit). On September 30, 2016, he received a flu vaccine in his left deltoid at one of the medical facilities in Kentucky where he worked on a contract basis as a radiologist. Exhibit 3 at 1.

On October 31, 2016, Petitioner submitted a written report to the medical facility where he received the vaccination. Exhibit 5. The report described the improperly administered vaccination, the pain and limited range of motion ("ROM") he had experienced within two hours, and his consultation with an orthopedist "[a]fter several weeks of persistent pain." *Id.* at 1. He indicated he had contacted the nurse who administered the vaccine three days and two weeks after vaccination and reported the injury to employee health on October 28, 2016. *Id.*

Petitioner underwent an MRI on November 4, 2016 (Exhibit 7 at 1-3), and was seen by a local orthopedist, Dr. Tillett, on November 21, 2016 (Exhibit 2 at 4-5). At the orthopedic visit, Petitioner reported "almost immediate pain and . . . difficulty using the arm for 3 or 4 weeks" following his flu vaccine which he believed was improperly placed. *Id.* at 4. His pain and movement improved slightly but then reoccurred when he attempted to increase his activity. *Id.* Upon examination, Petitioner exhibited good strength and ROM. *Id.* at 5. After reviewing the MRI, Dr. Tillett opined that Petitioner had suffered a SIRVA and instructed him to take anti-inflammatory medication and to stretch using exercise bands. *Id.* at 4.

From April 10-13, 2017, Petitioner and his wife visited the Mayo Clinic in Minnesota for his left shoulder pain and comprehensive medical visits for them both.[3] Petitioner was first seen on April 10, 2017, by Dr. Bierle for a multiple issue evaluation which included his left shoulder pain. Exhibit 2 at 50. He reported that his pain and limited ROM had been improving for the first two months after vaccination but then plateaued during the last three months. *Id.* Reporting discomfort with normal activities, Petitioner assessed his pain level as two to four out of ten, four being with movement. *Id.* at 51. Diagnosing Petitioner with SIRVA and adhesive capsulitis, Dr. Bierle referred Petitioner to a specialist within the Mayo Cinic. *Id.* at 54. It appears that Petitioner's prior test results, including the MRI he underwent on November 4, 2016, were reviewed that day. Exhibit 1 at 77.

The next day, on April 11, 2017, Petitioner was seen by Dr. Wisniewski in Physical Medicine & Rehabilitation. Exhibit 1 at 45-46. He again reported immediate pain upon vaccination which became debilitating within two hours. *Id.* at 45. Indicating he had been diagnosed with adhesive capsulitis by his local orthopedist, Petitioner reported a 40 percent improvement[4] with stretching exercises but continued pain at a level of two to seven out of ten. *Id.* Upon examination, Petitioner was observed to have tenderness over his lateral subacromial space and humeral head. For ROM, he showed abduction of 100 degrees, forward flexion of 130 degrees, and passive movement of 20 degrees. Dr. Johnson, who had reviewed Petitioner's November 4, 2016 MRI, was consulted, and it was recommended that Petitioner undergo another MRI, followed by a cortisone injection and physical therapy ("PT"). *Id.* at 46.

On April 12, 2017, Dr. Wisniewski discussed the results of the MRI performed the day before, which showed "marked capsulitis and subacromial/subdeltoid bursitis with erosive change at the distal infraspinatus tendon insertion on the humeral head." Exhibit 1 at 27. Comparing this recent MRI to the one Petitioner underwent in early November 2016, Dr. Wisniewski observed that the erosive changes on Petitioner's humeral head were increasing. He ordered testing and referred Petitioner to Infectious Disease to rule out infection or inflammatory arthritis. *Id.*

Petitioner then returned to Dr. Bierle (who had by this point spoken to Dr. Wisniewski). Exhibit 1 at 25-26. Noting that Petitioner had an appointment the next day at Infectious Disease, Dr. Bierle reiterated the importance of ruling out any infection

---

[3] As Petitioner explained during the January 12, 2021 damages hearing, he and his wife receive their primary medical care through a concierge program at the Mayo Clinic, which allows access to any needed specialist during comprehensive visits. Transcript ("Tr.") at 102; *see also* Tr. at 32-34 (testimony from Petitioner's wife). Petitioner also attended medical school at and performed his radiology residency at the Mayo Clinic. *E.g.,* Exhibit 1 at 42.

[4] The report from Dr. Woods, who was assisting Dr. Wisniewski on April 11, 2017, provided the same history. Exhibit 1 at 41-44. However, that record contains one minor difference, that Petitioner's improvement until he plateaued was 20 to 50 percent. *Id.* at 41

4

before Petitioner was administered a cortisone injection. *Id.* The lesser concern was the possibility of inflammatory arthritis, as it was less likely and meant a cortisone injection would not be harmful.

On April 13, 2017, Petitioner was seen by Dr. Tande at Infectious Disease. Exhibit 1 at 23-24. Providing the same history of pain after vaccination, Petitioner reported improvement of 40 percent but "pain with certain maneuvers . . .[and] no pain at rest." *Id.* at 23. While opining that the possibility "for ongoing infection [wa]s low," Dr. Tande recommended fluid aspiration to definitively rule it out. *Id.* at 24. Dr. Steinmann from the Hand Clinic also examined Petitioner and agreed with Dr. Tande's recommendation. *Id.* at 22; *see id.* at 19. Dr. Steinmann observed the same pain with movement and reduced ROM noted by Drs. Wisniewski and Woods. *Id.*

When it seemed that a glenohumeral aspiration could not be scheduled for that day at the Mayo Clinic, Dr. Bierle discussed the possibility of it being performed after Petitioner returned home to Kentucky. Exhibit 1 at 20. On April 14, Petitioner sought further details through on-line communication with Dr. Tande so he could schedule the needed aspiration with a local provider. *Id.* at 13. Dr. Bierle summarized this plan during on-line communication on April 17, and a nurse from his office sent a follow-up communication on April 27. *Id.* at 9.

On May 1, 2017, Petitioner visited his local orthopedist, Dr. Tillett. Exhibit 2-3. Dr. Tillett characterized Petitioner's injury as adhesive capsulitis secondary to inflammation of the glenohumeral joint. *Id.* at 2. Comparing the MRIs performed in November 2016 and April 2017, he observed the increased change noted by the physicians at the Mayo Clinic. *Id.* at 3. Upon examination, Petitioner exhibited good strength and limited ROM, described as 140 degrees for forward flexion, internal rotation to L1, and external rotation of 45 degrees. *Id.* at 2. Attempting glenohumeral aspiration, Dr. Tillett was unable to collect any fluid, and therefore proposed arthroscopic surgery. *Id.* On May 11, 2017, Petitioner discussed Dr. Tillett's recommendation with Dr. Bierle, who thought a bone scan would be the best next step. Exhibit 1 at 7.

Returning to the Mayo Clinic, Petitioner was seen by Dr. Wisiewski on June 13, 2017. Exhibit 27 at 8. Petitioner reported that "his shoulder [wa]s perhaps slightly better . . . [and] his range of motion may have improved mildly." *Id.* Dr. Wisniewski assessed Petitioner as having "internal rotation . . . to upper lumber," passive external rotation to 20 degrees and full strength. Reviewing an x-ray taken the previous day, Dr. Wisniewski observed that the mild depression and irregularity seen on Petitioner's posterior superior humeral head appeared unchanged compared to April. *Id.*; *see id.* at 7 (results of x-ray taken on June 12, 2017). He noted that Petitioner had a pending indium scan and visits at Infectious Disease and Orthopedics. *Id.* at 8. He reiterated his belief that the best step, if infection was ruled out, would be a guided cortisone injection followed by PT, and

5

Petitioner agreed. *Id.* Testing performed later that day, which included bone marrow aspiration and a bone scan, showed no evidence of infection. Exhibit 27 at 10-12.

On June 14, 2017, Petitioner was seen by Dr. Bierle, who noted Petitioner's slight improvement, continued limitations in ROM, and lack of any evidence of infection. Exhibit 27 at 13. Dr. Bierle agreed with Dr. Wisniewski's proposal of a guided cortisone injection, preferring that Petitioner first saw Drs. Tande and Steinmann, at Infectious Disease and the Hand Clinic respectively. *Id.* at 14.

When seen at the Hand Clinic on June 15, 2017, by Dr. Soukup, Petitioner was observed as having mildly limited forward flexion (140 degrees as compared to 160 degrees for his right shoulder) and more drastic limitation in external and internal rotation (respectively 15 compared to 70 degrees and to T12 rather than to T6). Exhibit 27 at 16. Both Dr. Soukup, and Dr. Sia at Infectious Disease, agreed there was no evidence of infection, however, allowing Dr. Leslie to undergo a guided cortisone injection. *Id.* at 17-18. They also informed Petitioner that they "d[id] not expect any structural damages to occur at the area of erosive bone noted on imaging." *Id.* at 17. The guided cortisone injection was performed that day at the Musculoskeletal Clinic by Dr. Duck. *Id.* at 20. During this visit to the Mayo Clinic, Petitioner also underwent further testing regarding indications of possible lung cancer seen on an earlier PET scan. *E.g., id.* at 37.

At his initial PT evaluation on August 23, 2017, Petitioner reported improvement in his ROM and pain following the injection he received in June 2017, but continued weakness, limited ROM, and an inability to perform daily tasks. Exhibit 4 at 2. Petitioner rated the level of his pain as eight at worst, three at best, and four currently. *Id.* By his second PT session, on September 11, 2017, Petitioner's pain level had reduced to four at worst, two at best, and two currently. *Id.* at 13. One week later at his third PT session, Petitioner reported additional improvement to one at worst, zero at best, and one currently. *Id.* at 16. When discharged from PT, after his fourth PT session on October 10, 2017, he rated his level of pain as one at worst, zero at best, and zero currently. *Id.* at 19. Petitioner had met all PT goals except the one related to his external rotation which was assessed as being 90 percent met. *Id.* at 23.

Petitioner returned to the Mayo Clinic four months later (on February 22, 2018) and was seen by Dr. Sinaki. Exhibit 17 at 1-2. Reviewing former and updated x-rays, Dr. Sinaki noted that the "mild irregularity along the posterosuperior humeral head . . . [wa]s not significantly changed from the x-ray of June 12, 2017." *Id.* at 1. Reporting that his pain had decreased significantly, Petitioner stated that his main concern was his external rotation which was still less than that of his right arm. *Id.* During his examination, Dr. SInaki observed full ROM except for external rotation which lagged "by about 5 or maximum of 8 degrees." *Id.* at 2. Remarking that Petitioner was "applying extreme stretching procedures for gaining the last few degrees of external rotation," Dr. Sinaki was

6

concerned Petitioner could "induce more labral strain." *Id.* He described Petitioner as currently "pain free." *Id.* Dr. Sinaki recommended application of ultrasound while stretching, adding that Petitioner knew how to perform this exercise. He created a PT referral in Petitioner's electronic record which could be used if needed. *Id.*

It appears further PT was not needed, however, and the record does not establish that Dr. Leslie pursued it thereafter. When Petitioner was seen again at the Mayo Clinic, by Dr. Fabro over a year later (on June 18, 2019), he now reported that he had no pain or functional limitation, and that the slight lag in his external rotation had improved with home exercises. Exhibit 20.1 at 14. Dr. Fabro applauded Petitioner on his commitment to his home exercises and assessed him as "return[ed] to his functional baseline." *Id.* at 15.

### B.   Medical Article

The same history consistently provided by Petitioner when seeking medical care is repeated in the article discussing his specific case of SIRVA – co-authored by Dr. Leslie himself. Littrell et al., *Progressive Monoarticular Inflammatory Arthritis Following Influenza Vaccination*, Mayo Clin Pro Inn Qual Out (2020), filed as Exhibit 31. The article describes Petitioner's onset, within two hours; subsequent decline; and then improvement. *Id.* at 2-4. The results of MRIs and x-rays and treatment Petitioner received are also discussed in detail. *Id.*

Describing the SIRVAs documented in medical literature, the article emphasizes the unique nature of Petitioner's injury. Exhibit 31 at 4-5. Although a small number of cases involving a bone injury following vaccination are mentioned, Petitioner's SIRVA is classified as the only case in which "progressive erosive changes were demonstrated along with an increase in severity of changes suggesting bursitis, synovitis, and adhesive capsulitis on serial examinations over a 6-month period." *Id.* at 5. Additionally, the permeance of the now-static bone loss is deemed rare. *Id.*

### III.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health &*

*Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merrow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579, 590 (2013). Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Vaccine Program. Id. at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

## IV.     Prior SIRVA Compensation Within SPU[6]

### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2021, 1,874 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 1,820 of these cases, with the remaining 54 cases dismissed.

Of the compensated cases, 1,058 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 47 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[7]

1,011 of this subset of post-entitlement determination, compensation-awarding cases were the product of informal settlement - 987 cases via proffer and 24 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or in sight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.,* No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (emphasis in original).

The remaining 762 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often

---

[6] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[7] *See, e.g., Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered[8] Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | 47 | 987 | 24 | 762 |
| **Lowest** | $55,619.60 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $75,044.44 | $74,040.17 | $90,000.00 | $47,500.00 |
| **Median** | **$86,784.56** | **$93,975.95** | **$115,214.49** | **$65,000.00** |
| **3rd Quartile** | $125,000.00 | $120,390.74 | $153,788.29 | $91,250.53 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $509,552.31 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 47 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $55,000.00 to $185,000.00, with $85,000.00 the median amount. Only four of these cases involved an award for future pain and suffering, with yearly awards range from $500.00 to $1,000.00.[10]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment of 40 days to over six months. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in ROM, and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. These SIRVAs usually resolved after one to two cortisone injections and two months or less of PT. None required surgery. The duration

---

[8] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

of the injury ranged from six to 29 months, with petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 50 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In three cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering. In the fourth case involving an award of future pain and suffering, the petitioner provided evidence of an ongoing SIRVA expected to resolve within the subsequent year.

### V.     The Parties' Arguments

Petitioner requests $180,000.00 for his past pain and suffering and $6,321.86 for his past medical expenses. Pet. Brief at 19. Despite maintaining that his pain, suffering, and emotional distress are well documented in testimonial affidavits, medical records, and medical literature, Petitioner requested a damages hearing as well, arguing that testimony would further help to describe the circumstances of his injury. *Id.* at 11-12, 19. Criticizing what he perceives as an overreliance on a distinction between cases involving surgery from those that do not, Petitioner insisted that his case, giving his sustained levels of pain and additional concerns regarding the bone loss, deserves a more significant award. *Id.* at 14-16.

Regarding the factors I should generally consider when determining the appropriate amount of compensation for pain and suffering, Petitioner agreed with Respondent's assertion awards from outside the Vaccine Program should be considered. Pet. Brief at 12-13. However, he claimed Respondent erroneously focused his search on a subset of these awards, when a more comprehensive review of these determinations would support an award more consistent with his request. *Id.* at 13-14. Petitioner also criticized what he believes is Respondent insistence that only information in medical records be considered as an incorrect reading of the Vaccine Act and caselaw. *Id.* at 8-10.

In reaction, Respondent maintained Petitioner should be awarded a little more than half of the demand, or only $91,500.00 for past pain and suffering, while accepting the past unreimbursed sum as reasonable. Res. Brief at 1 n.1. Focusing on the treatment

Petitioner received and his improved condition by 17 months after vaccination, Respondent argued that Petitioner is not entitled to a substantial award. *Id.* at 17-18. He also mentioned the fact that Petitioner had three flu vaccines, also in his left arm, following his SIRVA, and that, according to physicians at the Mayo Clinic, no structural damages is expected by the bone erosive Petitioner experience. *Id.* at 18.[11]

## VI.     Testimony and Affidavits

### A.     Written Witness Statements

In his first affidavit, Petitioner addressed the basic requirements of the Vaccine Act. Exhibit 6 at ¶¶ 2, 5, 10, 11; *see also* Section 11(c). He also described the onset of his pain and reports of his injury to the vaccine administrator. *Id.* at ¶¶ 6-9. Providing further detail in the supplemental affidavit he filed in April 2018, Petitioner described the difficulties he experienced working long hours as a radiologist, as well as sleeping and performing daily tasks. Exhibit 13 at ¶¶ 7, 9-11, 14. Prior to vaccination, he enjoyed an active and healthy lifestyle which included working in his yard and exercising regularly. *Id.* at ¶¶ 2-6. As his injury progressed, Petitioner experienced additional stress, compounded by his inability to engage in stress relieving exercise and the revelation that he was experiencing increasing bone erosion. *Id.* at ¶¶ 11-12, 15. Although Petitioner's pain and ROM improved with treatment, he noted the improvement was hard earned. "According to [his] physical therapist, [he] was the most compliant and hardworking patient that she ha[d] ever had." *Id.* at ¶ 18. Comparing his pain which he described as severe for nine months and then moderate thereafter to the pain he experienced after fracturing his wrist and ankle as a teenager, Petitioner maintained his SIRVA was worse. *Id.* at ¶ 13.

In her affidavit, Petitioner's wife described his determination, independence, and extreme work ethic. Exhibit 12 at ¶¶ 1-6. Mentioning the growing stress of Petitioner's work as a radiologist, she emphasized the importance of the stress relieving activities together, such as exercising, gardening, cooking, and travel. *Id.* at ¶¶ 7, 12, 15. She provided detailed descriptions of the difficulties Petitioner experienced after vaccination, attempting to sleep or move his arm. Noting how unusual it was for Petitioner to be limited by an injury (*id.* at ¶ 13), she described the seventeen months following the onset of Petitioner's SIRVA as "exceedingly difficult" (*id.* at ¶¶15).

---

[11] Respondent also spent greater than 50 percent of his brief discussing the Vaccine Act's $250,000.00 cap on awards for pain and suffering. Res. Brief at 9-17. As the guidance provided by the *Graves* decision is clear, however (*see supra* Section III), this argument will not be discussed further.

Petitioner also filed an affidavit from a colleague and friend, Dr. Jeffrey Boyd. Exhibit 11. In the affidavit, Dr. Boyd echoed the information regarding petitioner's prior condition and SIRVA symptoms provided by Petitioner and his wife. *Id.* at ¶¶ 2-6, 8-9. Dr. Boyd also opined that the findings of Petitioner's November 4, 2016 MRI, which he reviewed with Petitioner, "w[ere] markedly abnormal and the findings were clearly acute." *Id.* at ¶ 7.

### B. Hearing Testimony

In their testimony, both Dr. Leslie and his wife reiterated the information contained in their affidavits, adding additional details at certain points. For example, Petitioner's wife provided examples of the leisure and professional events Petitioner was forced to miss, and described her frustration due to her inability to help her husband. Tr. at 15, 17, 28. The Leslies also described the additional stress caused by the unique nature of his injury; the time it took to determine if it involved a more serious condition, such as an ongoing infection; and the uncertainty surrounding the effects of the continuing bone erosion. Tr. at 21-23, 29-30, 60-65, 69-70, 89-92. Petitioner specifically maintained that the lower number of PT sessions he participated in should not be viewed as an indication of milder symptoms, since (as a motivated individual and physician) he was able to do much of the PT on his own. Tr. at 84, 87.

Dr. Leslie also described in detail the difficulties his SIRVA caused while performing his job. Although he did not miss a day of work during this time, both he and his wife attributed that result to Petitioner's determination rather than mildness of the injury. Tr. at 13-14, 15-16, 36, 48. Even after his injury was close to complete resolution, the continued reduction in external rotation interfered with Petitioner's work. As a radiologist, Petitioner works at a station with several computer monitor panels extending to the left and right. Thus, external rotation of both arms is needed while performing certain tasks. Tr. at 50; *see also* Tr. at 12-15 (testimony from Petitioner's wife).

Regarding the duration of his SIRVA, Petitioner testified that it took 32 months for his injury to fully resolve. Tr. at 95. He indicated that he did not recall being pain free in February 2018 as noted by Dr. Sinaki in the medical records from that visit. Instead, he recalled his pain level being approximately three out of ten and his external rotation being limited about 20 degrees. Tr. at 105-06. Petitioner claimed he was not pain free with an almost full range of motion until seen by Dr. Fabro in June 2019. Tr. at 107-08.

### VII. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of

13

Petitioner's injury.

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my ultimate determination on the circumstances of this case.

I begin with the records themselves. It is well understood that contemporaneously-created medical records are entitled to significant weight in Program cases. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). While claimants can supplement those records with personal recollection and testimony, providing nuance or details that a record may lack, it is difficult for an individual to rebut what a record sets forth, absent a compelling showing and the proper circumstances. *Id.* (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ("Where such testimony is in conflict with contemporaneous documents we can give it little weight . . . .")).

Here, my review of the records leads me to conclude that Petitioner's SIRVA injury was not one of the more severe or onerous (especially when compared to those also resulting in pain and suffering awards in the Vaccine Program). Dr. Leslie suffered moderate to severe symptoms of pain and limited ROM until he received a cortisone injection in June 2017, followed by formal PT in late August through early October 2017. At that point (now twelve months after vaccination) Petitioner's pain levels had decreased significantly. Although Petitioner maintained he suffered severe pain throughout this time, the medical records suggest that he often rated his pain lower, as two to four and then two to seven. At most, Petitioner's pain was consistent, presenting more suffering than that experienced with intermittent pain. Petitioner's claim that that his synovitis was the most seen by experienced physicians at the Mayo Clinic is supported by the record in this case. However, the most severe pain levels reported by Petitioner can be found in the record from Petitioner's first PT session on August 23, 2017. At that time, Petitioner reported pain ranging from three to eight.

Following his last PT session on October 10, 2017, Petitioner's symptoms were consistently termed as mild. Although Dr. Leslie was clearly (and understandably) bothered by a continued reduction in external rotation, the medical records show this limitation was not significant, and he was otherwise relatively symptom-free for the remainder of his injury course. While Petitioner did not fully recover until June 2019, his SIRVA should be characterized as mild from October 2017 through this date. In comparison, I note that many Program petitioners *never* return to their functional baseline as Petitioner did in this case – and this may remain the case after many more PT sessions or invasive surgeries. They also often are not as healthy as Petitioner prior to vaccination,

14

nor as determined to fully recover – and the fact that Dr. Leslie never required a surgical procedure *does* bear on the pain and suffering calculation (although I accept his argument that it does not *prevent* an award by itself, or one higher than median).

The hearing testimony helped underscore the additional stress Dr. Leslie has experienced, given the uncommon form of his SIRVA presentation. There is reasonable uncertainty surrounding his continued bone erosion and possibility of an ongoing infection, and Petitioner has shown how this added to his pain and suffering. Moreover, these issues delayed effective treatment (a cortisone injection and PT), which Petitioner was unable to undergo until later in 2017. These additional stressors were present until nine months after vaccination, when Petitioner learned his bone erosion was not progressing further and there was no evidence of infection. They are all supportive of not only a pain and suffering award herein, but also one somewhat larger than I might otherwise conclude for a similarly-situated petitioner whose course was relatively short and featured mild symptoms and limited treatment.

At the same time, there is a somewhat-speculative quality to these issues which prevents me from embracing an award of the magnitude requested. *See J.T. v. Sec'y of Health & Human Servs.,* No. 12-0618V, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (finding special masters "cannot award speculative damages"). Dr. Leslie has not received a prospective diagnosis that his bone erosion will inevitably worsen or require further treatment. He is not scheduled for future treatment of any significance. Indeed, based on the records filed herein, it appears he has mostly recovered. In addition, his admirable personal qualities (hard work and professional dedication), coupled with his medical expertise, appear to have aided his weathering of the injury – and thus mitigated his loss somewhat. It is not my intent to belittle the evident suffering this injury imposed on Petitioner (and I hope the generous award I herein allow will underscore that), but my final determination is that the suffering he experienced does not justify the award requested.

Overall, given the unique circumstances of Petitioner's experience, I agree that he is entitled to a higher award than usual, and more than Respondent proposes – but less than what Petitioner has requested. To help me arrive at a precise number, I look to prior reasoned determinations involving comparable SIRVA injuries. Two non-surgical cases with awards greater than $100,000.00 are particularly instructive. *See generally Dawson-Savard v. Sec'y of Health & Human Servs.,* No. 17-1238V, 2020 WL 4719291 (Fed. Cl. Spec. Mstr. July 14, 2020); *Danielson v. Sec'y of Health & Human Servs.,* No. 18-1878V, 2020 WL 8271642 (Fed. Cl. Spec. Mstr. Dec. 29, 2020). Although *Danielson* involved a bone bruise as well as inflammation of her shoulder joint, the petitioner in that case did not suffer the bone erosion suffered by Petitioner. Additionally, the *Danielson* petitioner had unrelated conditions which constituted other sources of pain. *Id.* at *5. Thus, Petitioner's award for past pain and suffering should be greater than the $110,000.00

15

awarded to the petitioner in *Danielson. Id.* at *1, 7.

*Dawson-Savard* provides a slightly better comparable*. Dawson-Savard,* 2020 WL 4719291, at *1, 4. The *Dawson* petitioner experienced significant pain for more than 24 months, reporting moderate pain levels and severely decreased ROM during this time. *Id.* at *2-3. Deemed not suitable for surgery and requiring 13 cortisone injections, the *Dawson-Savard* petitioner was expected to have some permanent impairment. *Id.* The unique circumstances and additional stressors experienced by Petitioner dictate his award should be closer to the amount given to the petitioner in *Dawson,* but discounted slightly to account for the lessened degree of outright physical pain and suffering herein. Thus, since that petitioner received $130,000.00 (plus a future component of pain and suffering, which is not relevant herein), a reduced figure still in that general range is appropriate.

### VIII.   Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $125,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering. I also find that Petitioner is entitled to $6,321.86 for his past expenses.**

**I thus award Petitioner a lump sum payment of $<u>131,321.86</u>, representing $125,000.00 for his actual pain and suffering and $6,321.86 for his actual unreimbursable expenses in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this decision.[12]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u><br>
Brian H. Corcoran<br>
Chief Special Master

---

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.